**Michael C. HOULIHAN, Appellant,**

v.

**PARLIAMENT IMPORT COMPANY, Appellee.**

**No. 90–1246.**

United States Court of Appeals, Federal Circuit.

Dec. 17, 1990.

Hugh D. Finley, Phillips, Moore, Lempio & Finley, San Francisco, Cal., argued, for appellant. With him on the brief was Paul S. Lempio.

Stephen Meyers, Seidel, Gonda, Lavorgna & Monaco, P.C., Philadelphia, Pa., argued, for appellee. With him on the brief was Arthur H. Seidel.

Before LOURIE and RADER, Circuit Judges, and FRIEDMAN, Senior Circuit Judge.

FRIEDMAN, Senior Circuit Judge.

This is an appeal from the decision of the Trademark Trial and Appeal Board (Board) granting a concurrent use registration of a trademark. The appellant contends that the Board erroneously (1) upheld assignments of a trademark for concurrent use in contiguous domestic areas, and (2) ruled that such concurrent use would not result in likelihood of confusion. We affirm.

I.

For a number of years, Davis Bynum produced in California and marketed wine under the trademarks BAREFOOT BYNUM and a sketch of a human foot. In December 1985, Bynum licensed Mr. Lyon to use BAREFOOT BYNUM on its wine. Shortly thereafter Lyon and the appellant Houlihan agreed to produce and sell wine under the BAREFOOT BYNUM trademark.

In July 1986, Houlihan entered into an informal arrangement with the appellee Parliament Import Company (Parliament), which then was Bynum's exclusive distributor and marketing agent for Bynum wines in all states except California, Washington, Hawaii, Oregon and Alaska, where Houlihan sold wine under the Bynum name. Under this arrangement, Parliament performed some marketing services for Houlihan. The president of Parliament subsequently suggested to Houlihan that they attempt to obtain from Bynum concurrent assignments of the trademarks, which would be registrable in separate geographic markets.

The result was a September 1986 agreement among Bynum, Houlihan, and Parliament. The agreement recited (1) that Bynum "owns the entire right, title and interest in and to the Trademarks [BAREFOOT BYNUM and the foot design], together with the goodwill of the business symbolized by the Trademarks, and the right to register the Trademarks in the United States Patent and Trademark Office and elsewhere;" (2) that Parliament "is desirous of acquiring the Trademarks and the goodwill of the business symbolized by the Trademarks for the territory of" the United States, its territories and possessions except Alaska, Hawaii, Oregon, Washington, and California (this territory being referred to as "PARLIAMENT's Territory"), and "is desirous of registering the Trademarks in the United States Patent and Trademark Office, and elsewhere, for PARLIAMENT's Territory;" and (3) that Houlihan was "desirous of acquiring the Trademarks and the goodwill of the business symbolized by the Trademarks for the States of Alaska, Hawaii, Oregon, Washington and California, hereinafter referred to as 'HOULIHAN's Territory';" and "is desirous of registering the Trademarks in the United States Patent and Trademark Office, and elsewhere, for HOULIHAN's Territory."

Parliament agreed to pay Bynum $30,000 "for the assignment to PARLIAMENT and to HOULIHAN of the entire right, title and interest of the Trademarks, together with the goodwill of the business symbolized by the Trademarks, and the right to register them...." Bynum "assign[ed]" to Par-

liament and to Houlihan "all right, title and interest in and to the Trademarks, together with the goodwill of the business symbolized by the Trademarks, and any applications or registrations therefor ..., together with the right to register the Trademarks in the United States Patent and Trademark office and elsewhere for PARLIAMENT's Territory" and "for HOULIHAN's Territory", respectively. Bynum also agreed that "he will promptly execute upon the request of PARLIAMENT, or of HOULIHAN, ... any papers required to institute, complete, or effect the assignment and applications or registrations referred to in this Agreement." In a separate agreement, Houlihan agreed to pay one-half of the price for the assignments ($15,000) by giving Parliament a discount on wine Houlihan sold to Parliament.

Parliament then filed with the Commissioner of Patents and Trademarks an application for registration for concurrent use of the trademarks. It listed as an exception to its right to exclusive use of the marks Houlihan's right to use them in the five States that constituted Houlihan's Territory under the September 1986 agreement. Houlihan opposed the application for concurrent registration on various grounds, including the claims that he had "obtained rights to the two marks ... from the original owner Davis Bynum in early 1986" and that "Parliament is a mere distributor of wines labeled with The Marks and has performed no acts indicating its ownership of The Marks."

Both parties moved for summary judgment. The Board denied Houlihan's motion, granted Parliament's motion, and ruled that "Parliament will be issued concurrent use registrations covering the marks for all of the United States, its territories and possessions except the states of Alaska, Hawaii, Oregon, Washington and California." *Parliament Import Co. v. Houlihan*, No. 758, slip op. at 14 (TTAB Oct. 17, 1989).

The Board first rejected Houlihan's argument that the September 1986 agreement was "a distributorship arrangement," ruling that the agreement "clearly represent-

ed an assignment of the marks to these parties for consideration." *Id.* at 10.

The Board then held that Bynum owned the marks when it assigned them to Parliament and Houlihan in September 1986. It rejected Houlihan's contention that the assignment was invalid because it "divides a trademark between two owners":

Nor do we believe that a bar to concurrent registration is present when ownership by two or more entities was derived from a common source. Compare *U.S. v. Western Electric Co., Inc.*, 220 USPQ 113, 131 (DDC 1983) and *Morgan Services, Inc. v. Morgan Linen Service, Inc.*, — USPQ2d — (TTAB July 24, 1989).

*Id.* at 13.

Finally, in holding that there was no likelihood of confusion, the Board stated:

[W]e also believe that there is no genuine issue for trial. It is clear that each party is selling wine in a separate geographic area. With respect to advertising, the only evidence of record on this point is the declaration of [Parliament's president] Sheikman that both parties have used point-of-sale materials *exclusively* to promote the wine sold under the marks and that Parliament has no plans to promote this wine other than through point-of-sale materials. Parliament points out that in the absence of promotion through broadcast media or publications, any spillover advertising into the territory of the other party is unlikely. Also, Sheikman states that he knows of no instances of spillover advertising.

*Id.* at 13–14 (emphasis in original).

## II

It is surprising that the Board even entertained Houlihan's objection to Parliament's application for concurrent registration of the marks for Parliament's Territory.

In the September 1986 agreement, Houlihan recognized and accepted not only that Bynum assigned his interest in the marks to Parliament for Parliament's Territory, but also that Parliament intended to register the marks for that territory. Houlihan obtained similar rights in the marks

for his territory. To aid both Parliament and Houlihan in obtaining such registrations, Bynum agreed to execute "any papers required to institute, complete, or effect ... [those] applications or registrations...."

■ By entering into the agreement containing these terms and conditions, Houlihan acquiesced in Parliament's proposed registration of the marks for its territory. It therefore waived any right to object to such registration. In the circumstances, one would have expected that the Board would have held that Houlihan was estopped from challenging Parliament's applications for registration. This is particularly so in view of the Board's holding that Houlihan was estopped from making another contention: "[a]s a partner of the licensee Lyon, Houlihan is estopped from challenging the validity of Bynum's marks, especially since the facts upon which Houlihan bases his arguments arose prior to the license arrangement and not after it expired." *Parliament Import Co.*, No. 758, slip op. at 12.

■ The Board, however, decided the case on the merits. We review the Board's decision upon the ground upon which the Board based its action. *SEC v. Chenery*, 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947); *see also Ceramica Regiomontana, S.A. v. United States*, 810 F.2d 1137, 1139 (Fed.Cir.1987). We therefore reach and decide the merits.

### III

Houlihan contends that the Board erred (A) in permitting the assignment of a trademark for concurrent use in two contiguous domestic areas and (B) in concluding that such concurrent use would not create a likelihood of confusion.

A. Section 2(d) of the Lanham Act, 15 U.S.C. § 1052(d) (1988), authorizes registration of a trademark for concurrent use. It provides that

when the Commissioner determines that confusion, mistake, or deception is not likely to result from the continued use by more than one person of the same or similar marks under conditions and limitations as to the mode or place of use of the marks or the goods on or in connection with which such marks are used, concurrent registrations may be issued to such persons when they have become entitled to use such marks....

■ Nothing in this language precludes the Commissioner from issuing a concurrent registration merely because the prior owner of the mark assigned it for two contiguous domestic areas. The criteria for granting concurrent use registration relate not to the prior ownership of the mark but to the likelihood of confusion resulting from such concurrent use.

■ The Board here ruled that concurrent use of the marks by Parliament and Houlihan would not create a likelihood of confusion—a ruling we uphold in part III–B, below. The Board also held that the September 1986 agreement was an assignment, not a distribution agreement, and that under that agreement Parliament obtained the right to use the trademarks in its territory. In the circumstances, the Board was warranted in granting Parliament a concurrent use registration.

■ Houlihan contends, however, that the Board improperly "expanded the established line of cases that permit geographical or territorial assignment between a foreign organization and a domestic organization to include the right to assign and territorially divide a trademark between domestic organizations", and that such expansion "would inevitably lead to confusion in the marketplace." The fact that prior cases of territorial assignment of trademarks involved different factual situations does not establish the invalidity of the different assignment in the present case. As the Board explained in *Morgan Services Inc. v. Morgan Linen Services Inc.*, 12 USPQ2d 1841, 1842–43 (TTAB 1989):

[T]he acquisition of concurrent use rights through territorial assignment, while not the classic basis for claiming concurrent trademark rights at common law (adoption in a remote area without knowledge of the prior use being the classic formu-

lation), has nonetheless been recognized and validated by the courts. See *U.S. v. Western Electric Co., Inc. et al.,* 220 USPQ 113, at 124–131 (D.D.C.1983); cf. *K mart Corp. v. Cartier Inc.,* 486 U.S. 281 [108 S.Ct. 1811, 100 L.Ed.2d 313] (1988), 6 USPQ2d 1897.... As for *registration* as a concurrent user, we see no hostility inherent in the statutory scheme of Section 2(d) to this development in the law of concurrent use.

(Emphasis in original).

Since, as we now show, the Board justifiably concluded that there was no likelihood of confusion, the Board's alleged "expansion" of prior precedent to permit assignment of a mark to two different domestic contiguous users was proper.

B. In holding that there was no likelihood of confusion, the Board pointed out that Houlihan and Parliament were "selling wine in a separate geographic area", that the only evidence of record relating to advertising was that both parties "have used point-of-sale materials *exclusively* to promote the wine sold under the marks and that Parliament has no plans to promote this wine other than through point-of-sale materials", that "in the absence of promotion through broadcast media or publications, any spillover advertising into the territory of the other party is unlikely", and that Parliament's president "knows of no instances of spillover advertising." The Board concluded: "Because we believe that confusion will not be likely if the parties use and advertise their marks only in the respective territories, Parliament's motion for summary judgment is granted." *Parliament Import Co.,* No. 758, slip op. at 13–14 (footnote omitted).

 At the present time, all Barefoot wines being sold by both parties originate with Houlihan. Houlihan argues, however, that if Parliament purchases from other sources and sells wine under the Bynum trademarks, a difference in quality would confuse the public. There is, however, no legal requirement that concurrent use registrations issue only for goods of identical quality. As indicated by the Board in *Morgan Services,* 12 USPQ2d at 1842–43, in the usual situation, concurrent use registrations are sought for goods from unrelated producers. Moreover, Houlihan ignores the Board's determination that "confusion will not be likely if the parties use and advertise their marks only in the respective territories," which apparently would continue to be the practice even if Parliament purchased wine from producers other than Houlihan.

Houlihan also refers to two awards given to the Bynum wines and a letter in the Washington Post as establishing "a high *likelihood* of confusion" (emphasis in original). These snippets of evidence neither establish likelihood of confusion nor undermine the Board's contrary conclusion.

The September 1986 agreement further supports the Board's conclusion of no likelihood of confusion. There Parliament and Houlihan each acquired the trademarks "for its" territory and indicated that each intended to register the marks "for its territory." Each was therefore aware of the other's intention. Although the agreement did not include any explicit prohibition upon either party using the trademark in the territory of the other, that was the necessary implication of the foregoing provisions. Indeed, at oral argument Parliament admitted that the agreement precluded it from selling wine under the trademarks in Houlihan's Territory.

Although the September 1986 agreement did not contain any explicit provisions designed to avoid confusion or any explicit statement that the concurrent use of the trademarks in the parties' respective territories would not cause confusion, the recitals and undertakings in the agreement reflected the recognition by Parliament and Houlihan that concurrent use of the marks in their respective territories would not create a likelihood of confusion. What this court said in *Bongrain Int'l (American) Corp. v. Delice de France, Inc.,* 811 F.2d 1479, 1484–85, 1 USPQ2d 1775, 1778 (Fed. Cir.1987), a case in which an agreement between the parties stated that there was no likelihood of confusion from concurrent use, is equally applicable to the present case:

[I]n trademark cases involving agreements reflecting parties' views on the likelihood of confusion in the marketplace, ... they are in a much better position to know the real life situation than bureaucrats or judges and therefore such agreements may, depending on the circumstances, carry great weight....

## CONCLUSION

The decision of the Trademark Trial and Appeal Board is

AFFIRMED.